UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ROBERT CORWIN, Derivatively on behalf of SHOALS TECHNOLOGIES GROUP, INC., | CASE NO: |
| Plaintiff, | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY |
| vs. | DEMAND FOR A JURY TRIAL |
| BRAD FORTH, PETER WILVER, TY DAUL, TONI VOLPE, LORI SUNDBERG, JEANNETTE MILLS, ROBERT JULIAN, JASON WHITAKER, DOMINIC BARDOS, BRANDON MOSS, | |
| Individual Defendants, and | |
| SHOALS TECHNOLOGIES GROUP, INC., | |
| Nominal Defendant. | |

Plaintiff Robert Corwin ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Shoals Technologies Group, Inc. ("Shoals" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy the defendants' non-exculpable breaches of fiduciary duties.

Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the pre-suit investigation conducted by and through his attorneys, which included, among other things, public statements made by the Company and the Individual Defendants (defined below), U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Shoals, news reports, securities analysts' reports, court filings in related civil lawsuits, advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation and discovery.

## I.     INTRODUCTION

1.      This is a shareholder derivative action brought for the benefit of nominal defendant Shoals against certain current and/or former officers and directors based on their non-exculpable breaches of fiduciary duty and other serious misconduct as alleged in detail herein.

2.      According to the Company's public filings, Shoals is a provider of electrical balance of system ("EBOS") products for solar power generation, battery storage, and electric vehicle charging infrastructure. In the context of solar power generation, Shoals EBOS products encompass all of the components necessary to transport electric currents produced by solar panels to an inverter, allowing the current to be delivered to a power grid or an energy storage product.

2

3.      Shoals used polymer-insulated copper wires, which it purchased from a number of different suppliers, in its EBOS products. The wires served a critical role in Shoals EBOS products as part of custom wire harnesses that are used to aggregate electricity from multiple solar panels and deliver that electricity to inverters.

4.      The Company's public filings tout a "focus on quality and reliability" with regard to its EBOS components, from which Shoals generated the majority of its revenue. These components were backed by a product warranty Shoals provided to its customers. Shoals highlighted that its products "meet [the Company's] stringent quality requirements." As the Company's warranty supported the products meeting "stringent quality requirements," Shoals assured stockholders that its reported "Cost of Revenue" included costs related to product warranty liability.

5.      Shoals' Quarterly Report on Form 10-Q for the first quarter of 2023, filed with the SEC on May 8, 2023 (the "1Q23 10-Q"), informed stockholders of a potential issue involving "a subset of wire harnesses used in [Shoals'] EBOS solutions [] presenting excessive pull back of wire insulation at connection points," which the 1Q23 10-Q dubbed "shrinkback." The Individual Defendants sought to ease stockholders' concerns by reporting that the Company had "substantially ceased use of the related wire."

6.      Then, on August 1, 2023, the Individual Defendants caused Shoals to file its Quarterly Report on Form 10-Q for the second quarter of 2023 ("2Q23 10-Q") with the SEC and held a conference call with analysts to discuss its results for the quarter. The 2Q23 10-Q disclosed that Shoals had recorded a warranty liability of $9.3 million related to the shrinkback issue. During the corresponding call with analysts, Oppenheimer analyst Colin Rusch ("Mr. Rusch") asked the Individual Defendants to "talk a little bit about the wire issues . . . how

extensive it was in terms of the number of customers and number of shipments and how much time it was spread over?" In response, the Company's Chief Financial Officer ("CFO"), defendant Dominic Bardos ("Bardos") stated, "We've communicated pretty much everything we can." Defendant Bardos also confirmed that "[t]he charge that we booked in the quarter we believe is adequate to do the remediation required, and that's why we booked it."

7. In reality, and as remained undisclosed to stockholders, Shoals learned of customers experiencing wire insulation shrinkback by no later than March 2022. *See, e.g., Shoals Technologies Group, LLC v. Prysmian Cables and Systems USA, LLC*, Case No. 23-cv-1153 (M.D. Tenn.) (the "Prysmian Lawsuit"). According to the Prysmian Lawsuit, in March 2022, Shoals learned of exposed copper conduit resulting from shrinkback in EBOS wire harnesses at a customer's solar field in Arizona. Indeed, throughout 2022, Shoals learned of numerous customers experiencing similar copper conduit exposure, or shrinkback. As stockholders belatedly found out, Shoals had installed defective wire harnesses in at least 300 solar fields. These harnesses represented approximately 30% of the total amount of Shoals harnesses manufactured between 2020 and 2022. The Prysmian Lawsuit alleges that Shoals will incur "not less than $9.3 million to remedy" the purportedly defective wire.

8. On November 7, 2023, Shoals stunned stockholders by revealing that the Company had been forced to take an additional $50.2 million charge for warranty expense as result of the wire shrinkback issue. Shoals further advised that it expected the wire shrinkback issue to cost between $59.7 million and $184.9 million to remedy.

9. On this news, Shoals' stock price fell more than 20%, from a closing price of $16.23 per share on November 7, 2023, to a closing price of $12.95 per share on November 9, 2023, wiping out approximately $550 million in market capitalization. The Company's stock

price has only fallen further since that time, and currently trades for only approximately $7.50 per share.

## II.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

11.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Nominal Defendant Shoals maintains its principal executive offices in this District and conducts business in this District.

## III.     THE PARTIES

### A.     Plaintiff

15.     Plaintiff is a current holder of Shoals common stock and has continuously held Shoals common stock since January 2021.

### B.     Nominal Defendant

16.     Nominal defendant Shoals is a Delaware corporation headquartered in Portland, Tennessee.  The Company provides EBOS solutions and components for solar, battery energy,

and electric vehicle ("EV") charging applications in the United States and internationally. The Company designs, manufactures, and sells system solutions for both homerun and combine-as-you-go wiring architectures, as well as offers technical support services. Shoals' common stock trades on the NASDAQ exchange under the ticker symbol "SHLS."

### C. The Individual Defendants

17.     Defendant Brad Forth ("Forth") is the Board's Chairman and has served on the Board since 2021.

18.     Defendant Peter Wilver ("Wilver") is a current director and has served on the Board since 2021.

19.     Defendant Ty Daul ("Daul") is a current director and has served on the Board since 2021.

20.     Defendant Toni Volpe ("Volpe") is a current director and has served on the Board since 2021.

21.     Defendant Lori Sundberg ("Sundberg") is a current director and has served on the Board since 2021.

22.     Defendant Jeannette Mills ("Mills") is a current director and has served on the Board since 2022.

23.     Defendant Robert Julian ("Julian") is a current director and has served on the Board since 2021.

24.     Defendant Jason Whitaker ("Whitaker") is the Company's former Chief Executive Officer ("CEO") and was, during the Relevant Period, a member of the Company's Board. Defendant Whitaker announced his resignation on December 1, 2022 due to health reasons.

25.     Defendant Brandon Moss ("Moss") is the Company's current CEO, having been

appointed effective June 14, 2023. Defendant Moss has also served on the Board since that date.

26.     Defendant Bardos is the Company's CFO and has served as such since October 2022.

27.     Defendants Forth, Wilver, Daul, Volpe, Sundberg, Mills, Julian, Whitaker, Moss and Bardos are collectively referred to herein as the "Individual Defendants."

28.     During the Relevant Period, defendants Daul, Julian and Volpe served on the Board's Audit Committee and are referred to herein as the "Audit Committee Defendants".

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.  Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

31.     At all times relevant hereto, each of the Individual Defendants was the agent of

the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

32.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a.    manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.    neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.    establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.    neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.    ensuring that the Company maintained an adequate system of financial

controls such that the Company's financial reporting would be true and accurate at all times; and

h.     remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

33.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

34.     The Audit Committee Defendants owed specific duties to Shoals under the Audit Committee Charter ("Audit Charter"). According to the Audit Charter, the Audit Committee's purpose is as follows:

> The purpose of the Audit Committee is to oversee the Company's accounting and financial reporting processes and the audits of the Company's financial statements.
>
> ***
>
> The Audit Committee's principal responsibility is one of oversight. Management of the Company is responsible for preparing the Company's financial statements determining that they are complete, accurate, and in accordance with generally accepted accounting principles and establishing satisfactory disclosure controls and internal control over financial reporting. The independent auditor is

responsible for auditing the Company's financial statements and the effectiveness of the Company's internal control over financial reporting. The Company's internal and outside counsel are responsible for assuring compliance with laws and regulations and the Company's corporate governance policies.

35.     Among other things, the Audit Charter charges the Audit Committee Defendants with the following authority and responsibilities, among others:

a.     <u>Audit:</u> To review and discuss with the Company's independent auditor (1) the auditor's responsibilities under generally accepted auditing standards and the responsibilities of management in the audit process, (2) the overall audit strategy, planning and staffing, (3) the scope and timing of the annual audit, (4) any significant risks identified during the independent auditor's risk assessment procedures, and (5) when completed, the results, including significant findings, of the annual audit.

b.     <u>Audit Problems:</u> To review and discuss with the Company's independent auditor and management (1) any audit problems or difficulties, including difficulties encountered by the Company's independent auditor or internal audit department (if any) during their audit work (such as restrictions on the scope of their activities or their access of information), (2) any significant disagreements with management, and (3) management's response to these problems, difficulties, or disagreements; and to resolve any disagreements between the Company's independent auditor or internal audit department (if any) and management.

c.     <u>Internal Audit (if any):</u> To review, discuss with the Company's independent auditor, and approve the functions of the Company's internal audit department, including its purpose, authority, organization, responsibilities, budget, and staffing; to review the scope and performance of the department's internal audit plan, including the results of any internal audits, any reports to management, and management's response to those reports or internal audit.

d.    <u>Internal Controls:</u> To review with management, internal audit (if any), and the Company's independent auditor the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies, material weaknesses, or other major issues in the design or operation of, and any material changes in, the Company's controls and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such internal controls, and review and discuss with management and the Company's independent auditor disclosure relating to the Company's controls, management's and the independent auditor's report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

e.    <u>Risk Oversight:</u> To review and discuss with management the risks faced by the Company and the policies, guidelines, and process by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and cybersecurity risks and the steps management has taken to monitor and control such exposures.

f.    <u>Annual Financials:</u> To review and discuss with the Company's independent auditor and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the independent auditor on the financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual report on Form 10-K before the Form 10-K is filed. The Audit Committee shall recommend to the Board whether the audited financial statements should be included in the Company's annual

report on Form 10-K.

g. <u>Quarterly Financials</u>: To review and discuss with the Company's independent auditor and management the Company's quarterly financial statements (including the related notes) and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's quarterly report on Form 10-Q before the Form 10-Q is filed.

h. <u>Earnings Releases</u>: To review and discuss with management and the Company's independent auditor: (1) the Company's earnings press releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted, or other non-GAAP financial information; and (2) any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), provided that each earnings release or each instance in which the Company provides earnings guidance need not be discussed in advance.

i. <u>Financial Statements Issues</u>: To review with management and the Company's independent auditor: (1) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (2) analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; (3) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements; (4)

consideration of the judgment of both management and the independent auditor about the quality, not just the acceptability, of accounting principles; and (5) the completeness and clarity of the disclosures in the financial statements.

j.      <u>Quality Control/Independence Report</u>: At least annually, to obtain and review a report by the Company's independent auditor that describes (1) the independent auditor's internal quality control procedures, (2) any material issues raised by the most recent internal quality control review, peer review or Public Company Accounting Oversight Board review or inspection of the firm or by any other inquiry or investigation by governmental or professional authorities in the past five years regarding one or more audits carried out by the independent auditor and any steps taken to deal with any such issues, and (3) all relationships between the independent auditor and the Company or any of its subsidiaries in order to assess the independent auditor's independence.

## V.      FACTS

### A.      <u>Shoals' Background and Operations</u>

36.      Shoals is based in Portland, Tennessee and provides EBOS products for solar energy projects in the United States. The Company sells solar products principally to engineering, procurement, and construction firms ("EPCs") that build such solar energy projects. The Company designs, manufactures, and sells systems for two types of wiring architectures used by the U.S. solar industry: Homerun EBOS and Combine-as-you-go EBOS. In 2021 and 2022, Shoals derived 73% and 77.8% of its revenues, respectively, from the sales of these systems. By 2023, those products provided 81.5% of Shoals' revenues.

37.      A critical part of these EBOS systems is a custom wire harness that is used to aggregate electricity from multiple solar panels and deliver that electricity to inverters. The wires in these harnesses act as conductors, intended to carry high-voltage electricity. Shoals purchases

these wires from a number of different suppliers to manufacture its EBOS products.

38.     By March 2022, at the latest, Shoals received a report from a customer of exposed copper conductors on wire harnesses installed at the customer's Arizona solar field. Shoals, at its own expense, replaced the affected harnesses on the end-user's site. Numerous other Shoals customers reported similar instances of exposed cooper conductors in solar fields throughout 2022. Shoals installed EBOS systems with defective wire harnesses at approximately 300 solar fields, representing approximately 30% of all wire harnesses installed by Shoals between 2020 and 2022.

## VI.     THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

39.     On May 17, 2022, the Individual Defendants caused Shoals to file its Quarterly Report on Form 10-Q for the first quarter of 2022 (the "1Q22 10-Q"). The 1Q22 10-Q explained that "[w]hen we sell a system solution, we enter into a contract with our customers" that included a "warranty for the products being purchased," and falsely assured stockholders that the Company's reported "Cost of Revenue" included costs related to the "product warranty." The Individual Defendants also provided generic and boilerplate warnings that any "defects or performance problems in our products could result in loss of customers" and that the Company "may face warranty, indemnity and product liability claims arising from defective products."

40.     Meanwhile, throughout the Relevant Period, the Company's website touted that it "focus[ed] on [the] [q]uality and [r]eliability" of its EBOS components and that "Shoals products are built in a factory[-]controlled environment with calibrated machines and rigorous quality standards. Every component is fully tested using our in-house testing chambers to ensure that our EBOS solutions deliver the highest levels of quality and reliability."

41.     Likewise, Shoals' Quarterly Reports on Forms 10-Q for the second and third

14

quarters of 2022, respectively filed on August 15, 2022 and November 14, 2022 (the "2Q22 10-Q" and "3Q22 10-Q," respectively), repeated the same statements referenced in the preceding paragraphs verbatim, including the generic and boilerplate warnings that any "defects or performance problems in our products could result in loss of customers" and the Company "may face warranty, indemnity and product liability claims arising from defective products." The 2Q22 10-Q and 3Q22 10-Q were both filed with the consent and at the behest of the Individual Defendants.

42.     On February 28, 2023, the Individual Defendants caused Shoals to file its Annual Report on Form 10-K for 2022 ("2022 10-K"). The 2022 10-K reported that "as of December 31, 2022 and 2021 our estimated accrued warranty reserve was $0.6 million and $0.1 million, respectively." The 2022 10-K was signed by defendants Whitaker, Forth, Daul, Sundberg, Volpe, Wilver, Mills and Julian. With regard to product quality, the 2022 10-K assured stockholders that Shoals' "products meet our stringent quality requirements" and touted the Company's focus on "making quality foremost in all we do, make, and sell."

43.     On May 8, 2023, the Individual Defendants caused Shoals to file its 1Q23 10-Q with the SEC, which publicly disclosed for the first time that the "[C]ompany has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation at connection points." However, the 1Q23 10-Q downplayed the issue, stating that it was only "probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses," but that "it is not possible to reasonably estimate those costs."

44.     On August 1, 2023, the Individual Defendants caused Shoals to file the 2Q23 10-Q with the SEC and host a conference call with analysts and stockholders to discuss the

results. The 2Q23 10-Q disclosed that Shoals had recorded a $9.4 million charge for warranty expense due to the previously disclosed wire issue. This was substantially larger than the warranty reserve of $0.6 million disclosed in the Company's 2022 10-K. Despite the charge, the 2Q23 10-Q continued to describe quality control problems as a mere risk that could potentially materialize in the future, stating that "we may experience delays, disruptions or quality control problems in our manufacturing operations."

45.     The 2Q23 10-Q also repeated the generic and boilerplate warnings that:

> Any actual or perceived errors, defects or poor performance in our products could result in the replacement or recall of our products, shipment delays, rejection of our products, damage to our reputation, lost revenue, diversion of our engineering personnel from our product development efforts and increases in customer service and support costs, all of which could have a material adverse effect on our business, financial condition and results of operations defective components may give rise to warranty, indemnity or product liability claims against us.

46.     At the same time, the 2Q23 10-Q reassured stockholders that Shoals "conduct[s] quality assessments on [its] products and these products have stringent quality requirements."

47.     During the accompanying earnings conference call for the second quarter of 2023 held that same day, Oppenheimer analyst Mr. Rusch asked the Individual Defendants to "talk a little bit about the wire issues . . . how extensive it was in terms of the number of customers and number of shipments and how much time it was spread over?" In response, the Company's CFO, defendant Bardos stated, "[w]e've communicated pretty much everything we can," and "[t]he charge that we booked in the quarter we believe is adequate to do the remediation required, and that's why we booked it."

## VII.    THE TRUTH IS REVEALED

48.     On November 7, 2023 the Individual Defendants caused Shoals to file its Quarterly Report on Form 10-Q for the third quarter of 2023 ("2Q23 10-Q") and held an accompanying earnings conference call in which the Individual Defendants revealed that the

wire shrinkback issue was far more severe than previously disclosed. Specifically, the 2Q23 10-Q reported that the shrinkback issue affected ***30% of Shoals' wire harnesses installed between 2020 and 2022***, ***that Shoals booked a $50.2 million warranty expense for the second quarter of 2023*** related to the shrinkback issue, and ***provided a range of potential loss related to the shrinkback issue of $59.7 million and $184.9 million***.

49. Notably, documents from the Prysmian Lawsuit, which Shoals brought against the supplier of the wire related to the defective wire harnesses, have shown that Shoals knew of significant issues with shrinkback by at least March 2022—more than a year and a half before the Individual Defendants disclosed the huge liability it would entail to stockholders. As Shoals itself alleged in the Prysmian Lawsuit, in March 2022, the Company received information about exposed copper conduit on wire installed in Shoals EBOS components at a customer's solar field in Arizona. On March 24, 2022, Shoals representatives and others visited the solar field and inspected the defective wire harnesses. Thereafter, Shoals replaced those harnesses at its own expense. In addition, as Shoals admits, by "late 2022 . . . numerous other Shoals' customers began reporting similar instances of cooper conductor exposure."

50. Similarly, in connection with the counterclaim filed by the wire supplier in the Prysmian Lawsuit, the supplier stated that in April 2022, Shoals conceded that the wires used in the harnesses were not in any way defective, but instead, that Shoals' installation or cable management issues had caused the shrinkback in the harnesses. Further, the wire supplier's counterclaim alleged that no other customer of the wire supplier had reported any issue with shrinkback.

51. Following the November 7, 2023 disclosures, the price of Shoals' stock dropped by $3.28 per share, or more than 20%, to close at $12.95 per share on November 9, 2023, wiping

out approximately $550 million in market capitalization. The Company's stock price has only fallen further since that time, and currently trades for only approximately $7.50 per share.

## VIII.  DAMAGES TO SHOALS

52.     Shoals has been, and will continue to be, severely damaged and injured by the Individual Defendants' breaches of fiduciary duty and other misconduct.

53.     As a direct and proximate result of the Individual Defendants' misconduct, Shoals has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

a.  legal fees associated with the lawsuits filed against Shoals and its officers and directors for violations of the federal securities laws;

b.  legal fees associated with the Prysmian Lawsuit (and countersuit) related to the allegedly defective wire;

c.  loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

d.  amounts paid to remediate the faulty harnesses (*i.e.*, the shrinkback); and

e.  loss of revenues and profits.

## IX.     DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

54.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

55.     Plaintiff is a current shareholder of the Company, was a shareholder of the Company at the time of the Individual Defendants' wrongdoing alleged herein, and has been a shareholder of the Company continuously since January 2021.

56.     Plaintiff will adequately and fairly represent the interests of the Company and its

shareholders in enforcing and prosecuting its rights.

57.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

58.     The Board currently consists of eight (8) directors: defendants Daul, Forth, Julian, Mills, Sundberg, Volpe, Wilver, and Moss. A derivative plaintiff need only demonstrate reason to doubt that half of the directors are disinterested or objective in order to establish pre-suit demand excusal. Plaintiff has adequately alleged that there is reason to doubt that at least four (4) current directors of Shoals are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

A.     **Defendant Moss is Not Independent**

59.     Defendant Moss is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action because defendant Moss's principal professional occupation is his employment as CEO of the Company.

60.     The Company's Proxy Statements on Form DEF 14A also admit that defendant Moss is not independent.

61.     Defendant Moss is also a named individual defendant in the federal securities fraud class action pending against the Company. *See Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund v. Shoals Technologies Group, Inc. et al.*, Case No. 24-cv-00334 (M.D. Tenn.) (the "Securities Action").

62.     Accordingly, for these reasons, defendant Moss is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against those defendants who control his annual compensation.

19

### B.    A Majority of the Board Members Face a Substantial Likelihood of Liability Because They Signed False and Misleading SEC Filings

63.    The Individual Defendants had a duty to ensure that the Company's SEC filings were truthful, accurate and did not contain material misstatements or omissions. Again, each Individual Defendant failed to do so. A director's breach of the duty of candor is not entitled to protection under the business judgment rule.

64.    As described above in ¶44, defendants Whitaker, Forth, Daul, Sundberg, Volpe, Wilver, Mills and Julian each signed the 2022 10-K, which contained materially false and misleading statements to stockholders regarding the amount of the Company's warranty reserve ($0.6 million as of December 31, 2022). When the 2022 10-K was filed on February 28, 2023, the Individual Defendants and the Board were well aware of substantially increasing liability for warranty repairs due to the shrinkback issue caused by the allegedly defective Prysmian red wire. As the Company stated in its Prysmian Lawsuit, on March 24, 2022, Shoals representatives and others visited the solar field and inspected the defective wire harnesses. Thereafter, Shoals replaced those harnesses at its own expense. In the Prysmian Lawsuit, Shoals also states that, by "late 2022 . . . numerous other Shoals' customers began reporting similar instances of cooper conductor exposure." Given that the Prysmian Lawsuit estimated repair costs to be at least $9.3 million, it was a breach of fiduciary duty for the Individual Defendants to sign the materially false and misleading 2022 10-K, which severely underestimated the amount of warranty reserves necessary to remedy the defective wire harnesses, and then to take no action to correct their material misstatements to stockholders. The timing of these events is critical. The Prysmian Lawsuit claims Shoals first had knowledge of the problems in March 2022 and began repair work – on Shoals' own dime – shortly thereafter. The Individual Defendants did not cause the 2022 10-K to be filed with the SEC until almost a year after Shoals' knowledge of the increasing

repair costs. The Prysmian Lawsuit clearly acknowledges that repair costs will be substantially higher than the $0.6 million reserve estimate.

65.     The Individual Defendants had a duty to truthfully and accurately disclose to shareholders their knowledge of the defective wire harnesses and the likely costs associated with remediation. They did not do so. As such, Whitaker, Forth, Daul, Sundberg, Volpe, Wilver, Mills and Julian each face a substantial likelihood of personal liability, excusing demand. Their knowing and/or reckless breaches of fiduciary duty constitute bad faith under Delaware law. Bad-faith conduct is non-exculpable and is not protected under the business judgment rule. Demand is thus futile and excused.

### C.    The Audit Committee Defendants Face a Substantial Likelihood of Personal Liability, Excusing Demand

66.     Defendants Daul, Julian and Volpe served as members of the Audit Committee during the Relevant Period and therefore were duty-bound to remain sufficiently informed about the Company's accounting procedures and its internal controls at all times, and yet just as clearly they each disregarded such duties. Defendants Daul, Julian and Volpe have each failed to comply with their obligations pursuant to the Audit Committee Charter, which, among other things, enumerated the following requirements:

> Risk Oversight: ***To review and discuss with management the risks faced by the Company and the policies, guidelines, and process by which management assesses and manages the Company's risks***, including the Company's major financial risk exposures and cybersecurity risks and the steps management has taken to monitor and control such exposures.
>
> ***
>
> Annual Financials: ***To review and discuss with the Company's independent auditor and management the Company's annual audited financial statements*** (including the related notes), the form of audit opinion to be issued by the independent auditor on the financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual report on Form 10-K before

the Form 10-K is filed. The Audit Committee shall recommend to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K.

***

Quality Control/Independence Report: At least annually, to obtain and review a report by the Company's independent auditor that describes (1) the independent auditor's internal quality control procedures, (2) ***any material issues raised by the most recent internal quality control review***, peer review or Public Company Accounting Oversight Board review or inspection of the firm or by any other inquiry or investigation by governmental or professional authorities in the past five years regarding one or more audits carried out by the independent auditor and any steps taken to deal with any such issues, and (3) all relationships between the independent auditor and the Company or any of its subsidiaries in order to assess the independent auditor's independence.

67.     Given these duties, defendants Daul, Julian and Volpe had additional responsibilities with respect to oversight of the Company's risks, financial statements and quality controls. Because Prysmian red wire was installed in approximately 30% of the Company's solar installations, it is reasonable to infer that the Audit Committee would have discussed such a system risk to Shoals. Furthermore, it is reasonable to infer that the Audit Committee's oversight of the Company's quality controls, including the receipt of the required annual report on quality control procedures and ***any issue raised*** regarding quality control would have disclosed the allegedly defective Prysmian red wire. Based on this reasonable inference, defendants Daul, Julian and Volpe would therefore have known of the shrinkback problems during 2022 and nevertheless, these defendants permitted the issuance of multiple public SEC filings of the Company (including the 2022 10-K which each of defendants Daul, Julian and Volpe signed) which kept these significant risks hidden from stockholders. This decision was improper and is not an exercise of protected business judgment.

68.     These heightened duties and the Audit Committee Defendants' failure to ensure that the Company honestly and accurately disclosed these problems to stockholders, requires the

Court find these defendants are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

## COUNT I

### Breach of Fiduciary Duty Against the Individual Defendants

69.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

70.     The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

71.     The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

72.     The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

73.     The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Shoals were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary

violations of the securities laws.

74. The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Shoals, their control over, and/or receipt and/or modification of Shoals' allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Shoals, participated in the fraudulent scheme alleged herein.

75. As a result of the foregoing, the market price of Shoals common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Shoals common stock in purchasing Shoals common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

76. In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT II

### Breach of Fiduciary Duty Against the Individual Defendants

77. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

78. The Individual Defendants, as current or former Shoals officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

79.     By virtue of their positions as Shoals directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

80.     Each Individual Defendant was required to: (a) use his or her ability to control and manage Shoals in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Shoals rather than his or her own interests.

81.     By their acts alleged herein, including but not limited to causing Shoals to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

82.     The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

83.     Shoals has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Directing Shoals to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not

limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.    Awarding to Shoals restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Date: May 16, 2024

Respectfully submitted,

**BRAMLETT LAW OFFICES**

S/*PAUL KENT BRAMLETT*

Paul Kent Bramlett TN #7387  MS #4291
Robert Preston Bramlett TN#25895
40 Burton Hills Blvd., Suite 200
P. O. Box 150734
Nashville, TN 37215-0734
(615) 248-2828
pknashlaw@aol.com
Robert@BramlettLawOffices.com

*Local Counsel for Plaintiff*

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
(303) 861-3003

*Additional Plaintiff's Counsel*